IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

JAMES R. MARSHALL,　　　　　　　　）　　CASE NO.  1:19-CV-02637-JDG
　　　　　　　　　　　　　　　　　　）
　　　　　　　Plaintiff,　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　vs.　　　　　　　　　　　　　）　　MAGISTRATE JUDGE
　　　　　　　　　　　　　　　　　　）　　JONATHAN D. GREENBERG
COMMISSIONER OF SOCIAL　　　　　　）
SECURITY,　　　　　　　　　　　　　）　　**MEMORANDUM OF OPINION AND**
　　　　　　　　　　　　　　　　　　）　　**ORDER**
　　　　　　　Defendant.　　　　　　）
　　　　　　　　　　　　　　　　　　）

Plaintiff James R. Marshall ("Plaintiff" or "Marshall") challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

## I.　　PROCEDURAL HISTORY

In August 2016, Marshall filed an application for SSI alleging a disability onset date of August 1, 2014 and claiming he was disabled due to a bad back and an inability to read and write.  (Transcript

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

("Tr.") at 15, 21.)  The application was denied initially and upon reconsideration, and Marshall requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On May 9, 2018, an ALJ held a hearing, during which Marshall, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 31, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-28.)  The ALJ' s decision became final on September 18, 2019, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On November 12, 2019, Marshall filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14, 16.)  Marshall asserts the following assignments of error:

(1)  The ALJ failed to properly evaluate the evidence in this matter.

(2)  The ALJ did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 12 at 1.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Marshall was born in December 1968 and was 49 years-old at the time of his administrative hearing (Tr. 15, 26), making him a "younger" person under Social Security regulations.[2]  *See* 20 C.F.R. § 416.963(c).  He has a limited education and is able to communicate in English.  (Tr. 26.)  He has past relevant work as a roofer helper.  (*Id.* at 25.)

### B.  Relevant Medical Evidence[3]

A July 17, 2013 MRI revealed a diffuse disc bulge with mild thecal sac compression at the T12-L1

---

[2] As Marshall points out (Doc. No. 12 at 2), he changed age categories and became a "person closely approaching advanced age" during the time his request for review was pending before the Appeals Council.  (Tr. 1-6.)

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

level, advanced facet arthropathy without significant foraminal or canal stenosis at the L4/5 level, and bilateral pars defects with a grade 1 anterolisthesis of L5 on S1.  (*Id.* at 323.)  In addition, at the L5/S1 level, there was facet arthropathy, a diffuse disc bulge causing significant right neural foraminal narrowing with compression of the exiting neve root on the right, although not on the left, and degenerative disc disease.  (*Id.*)

On October 23, 2013, Marshall saw Andrea Lamastra, PT.  (*Id.* at 323.)  He reported diffuse low back pain and pain in his right leg that radiated down to his toes.  (*Id.* at 324.)  He described the pain as aching, tingling/prickling, sore, and numb.  (*Id.*)  He rated his pain at a 9/10 currently, and at a 5/10 at best and 10/10 at worst in the past week.  (*Id.*)  He described the pain as worse with sitting after 20-30 minutes, standing after sitting, and standing for 60 minutes.  (*Id.*)  Walking caused tingling.  (*Id.*)  His pain improved with hot showers and medicine.  (*Id.*)

On examination, his trunk range of motion during flexion was 65 degrees, and Marshall complained of increased low back pain and numbness/tingling in his right leg.  (*Id.*)  His trunk range of motion on extension was 12 degrees, with no low back pain but numbness and tingling in his right leg.  (*Id.*)  Marshall exhibited moderate limitation on side bending bilaterally.  (*Id.*)  His hip flexion was "grossly 90 degrees bilaterally," with increased low back pain on the right side.  (*Id.*)  His muscle strength was 5/5.  (*Id.*)  Sensation was intact to light touch in the legs bilaterally.  (*Id.*)  Marshall had a positive straight leg test on the right at 26 degrees and on the left at 45 degrees.  (*Id.*)  He walked independently without an assistive device.  (*Id.* at 325.)  PT Lamastra noted Marshall "currently demonstrates increased radicular symptoms with standing trunk flexion and extension.  Pt also demo decreased posture, +neural tension signs and decreased tolerance to functional activity.  Pt would benefit from PT to address current problems to work toward goals below."  (*Id.*)

Marshall underwent physical therapy through December 2, 2013.  (*Id.* at 312-22.)  During his

3

session on December 2, 2013, Marshall reported the pain "really hasn't changed." (*Id.* at 313.)  He was not limping on his right leg that day, but he did have to use a cane the other day.  (*Id.*)  Monique Boudreau, PT, noted his pain was 10/10 after the session.  (*Id.*)  Marshall did not present with increased pain with walking and did not appear in distress.  (*Id.*)  He had met his goals of increased right ankle strength to 5/5 and improved function to allow performing sit-stand without increased symptoms.  (*Id.*)  Marshall partially met his goal of decreasing right leg symptoms by 50%.  (*Id.*)

On December 9, 2013, Marshall went to the emergency room with middle and lower back pain.  (*Id.* at 310.)  Treatment records reflect "No injury but continues to have lower thoracic upper lumbar pain w/ new radiculopathy on right side. NO deficit but can't get comfortable at night." (*Id.*)  On examination, Marshall exhibited tenderness to palpation, with the right worse than the left, negative straight leg raise test, and normal gait and function.  (*Id.* at 312.)  He walked with a slight flexion in his back and was slow to move around.  (*Id.*)  Marshall was diagnosed with "acute on chronic lumbar strain/sprain." (*Id.*)

On July 16, 2014, Marshall saw Michael Steinmetz, M.D., for an evaluation of his low back and right leg pain.  (*Id.* at 298.)  Marshall reported the pain had been present for five years.  (*Id.*)  Marshall told Dr. Steinmetz the pain was worse with standing and walking.  (*Id.*)  On examination, Dr. Steinmetz found no pain to palpation along the spinous process or paraspinals.  (*Id.* at 300.)  Marshall had normal and symmetrical muscle bulk in the upper and lower extremities and normal muscle tone.  (*Id.*)  He had 5/5 muscle strength in all but his right leg, which was 4+ throughout but pain limited.  (*Id.*)  Marshall exhibited a normal gait.  (*Id.*)  Dr. Steinmetz noted he would schedule Marshall for back surgery.  (*Id.* at 301.)

On October 20, 2014, Marshall saw Elva Thompson, CNP, complaining of low back pain.  (*Id.* at 291.)  Marshall reported he did not want back surgery as some friends had the same surgery, and now they cannot walk.  (*Id.*)  He wanted to pursue conservative treatment.  (*Id.*)  Marshall reported his depression

4

was stable with his medication, he was sleeping well, and he did not feel depressed anymore.  (*Id.*)  He declined a psychiatric referral.  (*Id.*)  On examination, CNP Thompson found tenderness of the paraspinal muscles in the lumbar region and negative straight leg raise at 60 degrees.  (*Id.* at 292.)  Marshall exhibited no edema, no joint tenderness, a good range of motion, no calf tenderness, and no discolorations.  (*Id.*)  Marshall was aware CNP Thompson would not be continuing narcotics.  (*Id.*)

On December 8, 2015, Marshall saw Michael Harris, M.D., regarding "his long-standing history of low back and right leg pain, which seems to be getting worse."  (*Id.* at 282.)  Dr. Harris reviewed Marshall's imaging from 2013 and noted while he had ordered flexion and extension views that day, Marshall had not gone for them.  (*Id.*)  Dr. Harris recommended trying "a MBB targeting that L3-4 facet level as well as 1 above and below, to see if symptomatic and proceed with RFA."  (*Id.* at 283.)  Dr. Harris also ordered Marshall to continue using Voltaren and Zanaflex.  (*Id.*)

On December 17, 2015, Marshall saw CNP Thompson for follow up.  (*Id.* at 280-81.)  Marshall complained of "acute exacerbation of low back pain for the past 2-3 days, developed during bending."  (*Id.* at 281.)  Marshall reported his pain was aggravated by bending forward and lateral range of motion.  (*Id.*)  CNP Thompson noted Marshall was considering a spinal injection.  (*Id.*)  On examination, CNP Thompson found paraspinal muscle spasm and tenderness in the lower lumbar region, worse on the right side, but normal motor and sensory function.  (*Id.*)  She provided Marshall with a two to three-day supply of Percocet for breakthrough pain, 500 mg tablets of Tylenol, and ordered he continue to use Zanaflex and Voltaren.  (*Id.* at 282.)

On May 18, 2016, Marshall saw CNP Thompson for follow up.  (*Id.* at 277.)  Marshall complained of a flare up of his back pain for almost a month, and Voltaren and Zanaflex were no longer working.  (*Id.*)  Marshall reported he wanted to go back to the neurosurgeon and be rescheduled for surgery.  (*Id.*)  On examination, CNP Thompson found paraspinal muscle tenderness in the lower lumbar region and a

positive straight leg raise at 80 degrees, along with normal motor and sensory function.  (*Id.* at 278.)  CNP Thompson noted Marshall "would likely benefit from MIS TILF at L5/S1."  (*Id.*)  She provided Marshall with a couple days' supply of Percocet for breakthrough pain, ordered he continue his use of Zanaflex and Voltaren, and recommended Tylenol PM for headaches (not to be taken with Percocet).  (*Id.*)  CNP Thompson referred Marshall to Dr. Harris to see if he needed a new MRI before being scheduled for surgery. (*Id.*)

On July 28, 2016, Marshall saw CNP Thompson because he had run out of his muscle relaxer.  (*Id.* at 335.)  Marshall also reported feeling depressed since the death of his father four months earlier.  (*Id.*)  On examination, CNP Thompson found palpable tenderness in the lumbrosacral region with paraspinal muscle tightness, a positive straight leg raise test at 60 degrees, and normal motor and sensory function. (*Id.* at 336.)

On August 11, 2016, Marshall saw Dr. Harris for follow up.  (*Id.* at 273-74.)  Marshall complained of more pain in his back than his right leg and numbness in the back of his right calf.  (*Id.* at 274.)  Marshall reported using a cane to walk "at times," but said the cane was too short for him.  (*Id.*)  Marshall did not have a cane with him that day.  (*Id.*)  Marshall told Dr. Harris he was not ready for back surgery before, but he was now.  (*Id.*)  On examination, Dr. Harris found decreased lumbar lordotic curvature.  (*Id.* at 275.)  Range of motion during flexion was 45 degrees and 5 degrees on extension.  (*Id.*)  Marshall exhibited tenderness to palpation at the lumbosacral junction, the sacro-iliac joint bilaterally, and the lumbo-sacral spinal muscles bilaterally.  (*Id.*)  Dr. Harris found no evidence of a spasm or any trigger points.  (*Id.*)  Marshall had a positive straight leg test on the right with radicular symptoms and was positive for facet loading.  (*Id.*)  Dr. Harris determined Marshall had normal sensation in all dermatomal regions in the lower extremities bilaterally, and while motor strength was pain limited in places on the right, it was otherwise normal in all myotomal regions in the lower extremities bilaterally.  (*Id.*)  Marshall

6

walked with an antalgic gait.  (*Id.*)  Dr. Harris noted Marshall had failed physical therapy.  (*Id.*)  Dr. Harris recommended an updated MRI for surgical planning, a referral for flouro-guided "right L5-S1 TFESI," and a referral back to neurosurgery "for possible PLIF."  (*Id.*)  Dr. Harris suggested if there was no improvement with the TFESI, they could "consider L3,4,5 B/L MBB for facet arthropathy."  (*Id.*)

On September 26, 2016, Tricia Cator completed a Function Report for Marshall.  (*Id.* at 202-209.)  Marshall reported he could not stand for long periods of time or lift heavy objects due to a back injury.  (*Id.* at 202.)  In addition, he could not read, write, focus, or comprehend tasks.  (*Id.*)  He stated he was in constant pain, which made him depressed.  (*Id.*)  His girlfriend reminded him to shower.  (*Id.* at 203.)  He needed help taking his medications, as he could not read the labels to know which one to take.  (*Id.*)  He did not cook or do yard work.  (*Id.*)  He reported he had a hard time dressing and bathing because he had a hard time bending, his girlfriend shaved him, and other people helped feed him.  (*Id.* at 204.)  He could not bend or stand for very long.  (*Id.* at 205.)  He did not go out alone most of the time as he needed someone to read things for him and explain things to him.  (*Id.*)  He could drive, but only when he needed to do so.  (*Id.*)  He did not like being around too many people at a time or people he did not know.  (*Id.* at 207.)  He could only lift five pounds, walk for five or ten minutes before needing to rest, and had to rest for about 15 minutes before walking again.  (*Id.*)  He got confused with changes in his routine, and he got emotional since he could not work or take care of himself.  (*Id.* at 208.)  He reported using a cane, which he said was prescribed by a doctor a few months ago.  (*Id.*)

On November 9, 2016, Marshall saw Deborah Koricke, Ph.D., for a consultative examination.  (*Id.* at 362-370.)  Marshall arrived with his girlfriend of 27 years, who had to fill out the forms for Marshall as he could not read or write.  (*Id.* at 362.)  Marshall reported he was too afraid to have surgery and decided not to have it.  (*Id.* at 364.)  Marshall told Dr. Koricke he had not been able to

work since 2007.  (*Id.* at 365.)  He reported he could not get a job now because you have to apply online and he cannot read or write.  (*Id.*)  His back pain stops him too much and he cannot bend or lift, so he cannot be a roofer anymore.  (*Id.*)  Marshall told Dr. Koricke when he was working "he got along okay with other coworkers and with supervisors and does not recall having been terminated." (*Id.*)  Marshall had never received mental health treatment.  (*Id.*)  He received psychiatric medications from his primary care doctors.  (*Id.*)  Marshall reported he had never been suicidal or homicidal.  (*Id.*)  He was depressed because his father died years ago and their relationship had never been repaired, and his twenty-year old niece had died of a heroin overdose six months ago.  (*Id.*)

Marshall told Dr. Koricke he was unable to cook, clean, do laundry, or shop, which his girlfriend did by herself.  (*Id.* at 365-66.)  His girlfriend reported she told him to shower every day, but he only showered once or twice a week at most.  (*Id.*)  It was the same with changing clothes. (*Id.*)  Marshall stated he had no hobbies and never did, other than drinking beer a lot, and he is now sober.  (*Id.*)  Marshall reported watching TV and listening to the radio all the time.  (*Id.*)  Marshall said he went to bed between 9 and 10 p.m. and it took him one to one and half hours to fall asleep "because of his terrible pain."  (*Id.*)  He woke up at 5:00 a.m., but he took no naps.  (*Id.*)  His appetite was fine and had not changed, and he was able to drive a car that he shared with his girlfriend.  (*Id.*)

On examination, Dr. Koricke noted Marshall "had a very significant odor of body odor and cigarette smoke," and his cloths were dirty, ripped, and torn.  (*Id.*)  He bathed once a week, and his girlfriend, who "also was significantly malodorous herself," agreed that was enough.  (*Id.*)  Marshall was cheerful, but he did not appear to relax, although he was cooperative and demonstrated good eye contact.  (*Id.*)  Marshall used a cane and "walked in a very awkward fashion to the exam room from the waiting room."  (*Id.*)  Marshall demonstrated "sufficiently fluent, but extremely simplistic" speech.  (*Id.*)  His though processes during the examination "involved coherent and goal directed

responses." (*Id.* at 367.)  Marshall was "only slightly anxious," with a euthymic mood, and was "more focused on his physical pain." (*Id.*)  His only worry consisted of his concern regarding back surgery because he was afraid he would end up crippled. (*Id.*)

During cognitive testing, Marshall was off on the date by a month. (*Id.*)  He recalled one word out of three after a delayed recall but recalled all three with immediate recall. (*Id.*)  Marshall could not spell the word "world," and "had extreme difficulty counting back from 20 by 3s." (*Id.*)  Marshall "had no idea" what the phrase "Beauty is in the eye of the beholder" meant. (*Id.*)  He could only do three digits forward and two digits backward, and Dr. Koricke noted "it took him a very long time to do that, with much thinking and counting on his fingers." (*Id.*)  Dr. Koricke concluded "Marshall appeared to be clearly in the borderline range of intellectual functioning at best." (*Id.*)

Dr. Koricke determined Marshall had some depression and some anxiety, which prevented him from getting surgery that could have been helpful, as well as "some depression and unresolved issues with regard to his father." (*Id.* at 367-68.)

Dr. Koricke diagnosed Marshall with adjustment disorder with mixed anxiety and depressive mood, borderline intellectual functioning, reading learning disorder with impairment, SLD with math impairment, SLD with written expression impairment, and alcohol dependence in remission for two years. (*Id.* at 368.)  While Marshall reported he was unable to read, write, or do much math, "he was always able to work until, as he puts it, his physical problems caused him to be unable to due to [sic] his work as a roofer." (*Id.* at 369.)

In her discussion of the four work-related mental abilities, Dr. Koricke noted Marshall reported "he was always able to understand, remember, and carry out instructions of his work as a roofer, which is a fairly simplistic job." (*Id.*)  She stated Marshall told her his physical problems render him incapable of maintaining attention, concentration, persistence, and pace. (*Id.*)  Marshall

said he could do "very simple tasks" like bathing and other things but could not do "any other complex tasks or other simple tasks," citing "his back pain and concomitant restrictions." (*Id.*) Dr. Koricke opined getting along with coworkers and supervisors was "not seen as a problem area." (*Id.* at 369-70.) Dr. Koricke noted Marshall reported it was only his physical problems "that caused him to be unable to respond to work pressures appropriately." (*Id.* at 370.)

On January 6, 2017, Marshall saw Yevgeniya Dvorkin-Wininger, M.D., for follow up. (*Id.* at 376.) Marshall told Dr. Dvorkin-Wininger that he was unsure what happened with his injection and it may not have been approved by his insurance, but he had undergone an updated MRI. (*Id.* at 377.) Marshall rated his pain as 10/10. (*Id.*) The pain started in the middle of his back and went down his right leg into his toes. (*Id.*) Marshall described the pain in his leg as sharp. (*Id.*) Marshall denied any leg weakness, although he was using a cane since having a few falls. (*Id.*) Marshall reported the last time he fell his left leg had given out. (*Id.*) Marshall complained of intermittent numbness and tingling in his right leg, and that it felt like someone was poking his back with needles. (*Id.*) Bending over helped his pain, while extension made it worse. (*Id.*) Marshall reported the pain in his back was worse than the pain in his leg. (*Id.*)

The October 2016 MRI revealed "[s]evere degenerative disc disease at L5 and S1 with bilateral pars defect at L5-S1 and stable grade 1 spondylolisthesis of L5 on S1." (*Id.*) In addition, there was "severe stable foraminal narrowing on the right secondary to the spondylolysis and hypertrophic facet arthropathy and degenerative disc protrusion." (*Id.*) These findings were stable from Marshall's February 2013 MRI. (*Id.*)

On examination, Dr. Dvorkin-Wininger found decreased lumbar lordotic curvature. (*Id.* at 379.) Range of motion during flexion was 30 degrees and 5 degrees on extension. (*Id.*) Marshall exhibited tenderness to palpation at the lumbosacral junction, the sacro-iliac joint bilaterally, and the lumbo-sacral

10

spinal muscles bilaterally.  (*Id.*)  Dr. Dvorkin-Wininger found no evidence of a spasm or tightness but found multiple trigger points.  (*Id.*)  Marshall had a positive straight leg test on the right with radicular symptoms and was positive for facet loading.  (*Id.*)  Dr. Dvorkin-Wininger determined Marshall had normal sensation in all dermatomal regions in the lower extremities bilaterally, and while motor strength was pain limited in places on the right, it was otherwise normal in all myotomal regions in the lower extremities bilaterally.  (*Id.*)  Marshall walked with an antalgic gait.  (*Id.*)  Dr. Dvorkin-Wininger noted Marshall had failed physical therapy and conservative management, and he now had "progressive pain and debility."  (*Id.*)  Dr. Dvorkin-Wininger's recommendations echoed those from previous examinations, with the addition of trigger point injections.  (*Id.* at 380.)

On February 6, 2017, Marshall went to Broadway Orthopaedics & Sports Medicine of Ohio for an evaluation.  (*Id.* at 386.)  Marshall rated his pain as 2/10 at rest and 7/10 with increased activity.  (*Id.*)  On examination, flexion was decreased to ½ with left deviation, extension decreased to ¼ with left deviation, and right slide glide was decreased to ¼.  (*Id.*)  Marshall also had a positive "right DF break test with 4-/5 MMT."  (*Id.*)  Don Downing, DPT, assessed Marshall as having "significant deficits in functional abilities and would benefit from skilled PT services 2X/wk."  (*Id.*)

On February 8, 2017, Sharon Vandergriff completed a second Function Report.  (*Id.* at 220-27.)  Marshall reported he could not comprehend, read, or write, he had back and heart problems, and mental health issues.  (*Id.* at 220.)  His day consisted of getting up to use the bathroom, sitting and watching TV, taking the dog out, talking on the phone a little bit, and sleeping.  (*Id.* at 221.)  Marshall needed reminders to take the dog out and feed her.  (*Id.*)  He reported sleeping all the time because of his pain.  (*Id.*)  Marshall stated he could dress and feed himself and use the bathroom without assistance, but he needed reminders to bathe and occasionally needed help with bathing, he did not brush his hair, and his girlfriend had to shave him sometimes.  (*Id.* at 221-22.)  Marshall also

needed reminders to take his medication at the same time.  (*Id.* at 222.)  He did not cook or do yard work.  (*Id.*)  He did not go out alone because he had problems reading directions.  (*Id.* at 223.)  He could drive a car.  (*Id.*)

Marshall reported he had problems getting along with others because he had problems fitting in.  (*Id.* at 224.)  However, he tried to talk to his childhood friend on the phone everyday if he could.  (*Id.* at 225.)  He also stated he did not want to do anything, felt unhappy all the time, and felt helpless.  (*Id.* at 224.)  He could only lift five pounds and could walk for maybe about ten houses before his pain and anxiety started.  (*Id.*)  After walking a few minutes, he needed to sit back down and rest for a while.  (*Id.*)  He reported a short attention span and that he was unable to follow spoken instructions.  (*Id.*)  Marshall stated he had been fired from a job because of problems getting along with people, he did not like changes in his routine and got mad when they occurred, and he was afraid of people he did not know.  (*Id.* at 226.)  He reported using a cane when walking.  (*Id.*)  Marshall stated a doctor had prescribed the cane in 2016.  (*Id.*)

On February 9, 2017, Marshall began physical therapy.  (*Id.* at 419.)  His condition was described as moderate.  (*Id.*)  Marshall responded favorably to treatment and was improving.  (*Id.*)  Notes from his February 16, 2017 session reflect that Marshall noticed a benefit from therapy and performed well.  (*Id.* at 418.)

On February 24, 2017, Marshall underwent a second consultative examination, this time with Katherine Alouani, Psy.D.  (*Id.* at 395-401.)  Marshall reported that he was single, not in a relationship, and his friend of 28 years was not his partner despite a record review revealing he previously referred to her as his girlfriend.  (*Id.* at 396.)  Marshall told Dr. Alouani he had no friends, having lost them over the years because he had problems coping with people.  (*Id.*)  He reported watching TV and sitting around were his hobbies.  (*Id.*)  His daily activities consisted of waking up at

12

5:00 a.m., watching TV until 1:00 or 2:00 p.m., and then going back to sleep.  (*Id.*)  Marshall also reported napping a lot throughout the day.  (*Id.*)  Marshall told Dr. Alouani he had last worked in 2007, working at the I-X Center on and off.  (*Id.* at 397.)  He reported he worked there for about six months before he was fired for being unable to read.  (*Id.*)  Marshall stated he had been fired several times when employers discovered he could not read.  (*Id.*)  Dr. Alouani noted Marshall had an open referral for psychiatry at MetroHealth.  (*Id.*)  Marshall reported suicidal ideation and a suicide attempt two and a half months before when he tried to slit his wrists.  (*Id.* at 398.)  Marshall said he experienced anxiety when around others and that he got "very easily agitated and aggravated around other people."  (*Id.*)  Marshall told Dr. Alouani he could dress, bathe, and groom himself, but he did not cook.  (*Id.*)  He claimed his "depression interferes with his general cleaning and laundry and anxiety interferes with shopping for the things he needs."  (*Id.*)

On examination, Dr. Alouani found Marshall's demeanor open, his social skills limited but appropriate, and he was a little irritable throughout the evaluation.  (*Id.*)  He appeared somewhat disheveled and walked with a cane.  (*Id.*)  His motor behavior was appropriate, as was his eye contact.  (*Id.*)  While his speech intelligibility was fluent, his expressive and receptive language skills were "somewhat limited."  (*Id.*)  Marshall demonstrated a coherent and goal-directed thought process.  (*Id.*)  While his affect was somewhat irritable, his affect was "of full range and appropriate in speech and thought content."  (*Id.*)  Dr. Alouani found Marshall's attention and concentration, as well as his working memory, were impaired, and his recent and remote memory were mildly impaired.  (*Id.* at 399.)  Marshall refused to do simple calculations or serial 3s, stating "he cannot and would not engage in the task."  (*Id.*)  Dr. Alouani estimated Marshall's intellectual functioning to be in the low average to below average range and found his general fund of information limited.  (*Id.*)  Marshall demonstrated fair insight and judgment.  (*Id.*)  Dr. Alouani noted Marshall "appeared to attempt to answer

13

all questions," but later stated his performance on the mental status exam "was marked by noncompliance due to saying that he could not complete it."  (*Id.* at 399-400.)

Dr. Alouani diagnosed Marshall with alcohol use disorder in full sustained remission, other unspecified depressive disorder, and rule out borderline intellectual functioning.  (*Id.* at 399.)  Dr. Alouani opined that Marshall would likely struggle with understanding, remembering, and carrying out instructions and the combination of his personality or mood factors, as well as his cognitive abilities, may limit his ability to perform more complex tasks.  (*Id.* at 400-01.)  Dr. Alouani further opined Marshall may struggle to respond appropriately to new or more complex situations at work, and work pressures may exacerbate his symptoms of depression.  (*Id.* at 401.)

Marshall continued to attend physical therapy throughout March 2017.  (*Id.* at 410-16.)  Treatment notes from these sessions show Marshall performed well, responded favorably to treatment, and he was improving.  (*Id.*)  His condition was regularly identified as moderate.  (*Id.*)

## C.    State Agency Reports

### 1.    Mental Impairments

On November 18, 2016, Karla Delcour, Ph.D., opined Marshall had mild restriction in his activities of daily living, no difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation.  (*Id.* at 81-82.)

Dr. Delcour found Marshall would have moderate limitations in the following areas: ability to understand and remember very short and simple instructions, ability to understand and remember detailed instructions, ability to carry out detailed instructions, the ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others.  (*Id.* at 86-87.)  Dr. Delcour opined Marshall retained the capacity for simple-short cycle

14

tasks, could maintain attention and make simple work-related decisions, and was "capable of handling a work environment that does not consist of constant change and would not require a high level of mental demand." (*Id.*)

On March 14, 2017, on reconsideration, Patricia Kirwin, Ph.D., opined Marshall had moderate limitations in his abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (*Id.* at 101-02.)

Dr. Kirwin found Marshall had moderate limitations in the following additional areas: maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.* at 106-108.)

Dr. Kerwin opined Marshall retained the capacity to perform one to three step tasks, with no high pace or high production quotas. (*Id.* at 107.) "Although [Marshall] would likely perform optimally in a setting that entails minimal interaction, he can relate adequately on a superficial basis." (*Id.* at 108.) Dr. Kerwin further opined Marshall would "need major changes to a preset routine previewed and gradually introduced to allow time to adjust to the new expectations." (*Id.*) Marshall could "do tasks that do not require independent prioritization or more than daily planning." (*Id.*)

### 2.        Physical Impairments

On November 18, 2015, David Knierim, M.D., opined Marshall could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for four hours a day, and sit for about six hours in an eight-hour work day.  (*Id.* at 83, 86.)  His ability to push and/or pull was limited in his right lower extremity.  (*Id.* at 83-84.)  Marshall could occasionally climb ramps or stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.* at 84.)  He could frequently stoop, and his ability to balance, kneel, crouch, and crawl were unlimited.  (*Id.*)  Marshall must avoid all exposure to hazards.  (*Id.* at 85.)

On February 25, 2017, Diane Manos, M.D., affirmed Dr. Knierim's findings regarding Marshall's ability to lift, stand, walk, and sit.  (*Id.* at 104, 106.)  She agreed Marshall's ability to push and/or pull was limited in his right lower extremity.  (*Id.* at 104.)  Marshall could occasionally climb ramps or stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.*)  He could occasionally stoop, kneel, crouch, and crawl, although his ability to balance was unlimited.  (*Id.*)  Marshall must avoid all exposure to hazards.  (*Id.* at 105.)

### D.     Hearing Testimony

During the May 9, 2018 hearing, Marshall testified to the following:

- He last worked in 2007 for a couple of months.  (*Id.* at 40.)  He stopped working because he could not take the pain in his back anymore.  (*Id.*)  He left a job in 2006 because he could not get along with people after something went wrong.  (*Id.* at 41.)  He tried to apply for jobs after leaving there but no one would hire him.  (*Id.*)  He believed the reason no one hired him was because he needed to bring his fiancée with him to help him fill out the applications.  (*Id.*)  Since he stopped working, he has cut grass here and there, and two months ago he shoveled snow.  (*Id.* at 42.)

- His back pain got worse in 2007, but he could not remember what happened that made it worse.  (*Id.* at 43.)  It got to the point where he could not get up in the morning because of the pain.  (*Id.*)  He treats his back pain by sitting and laying around, and then getting up and walking around a little until the pain goes away.  (*Id.*)  He goes to a chiropractor every two months, but those visits cause him more pain than just sitting around.  (*Id.*)  He does not do anything else for his back pain.

16

(*Id.*) He was taking muscle relaxers, but they did not help so he stopped taking them. (*Id.* at 43-44.) He has "just been dealing with the pain." (*Id.* at 44.)

- He had a cane with him at the hearing. (*Id.*) He had been using it for about seven months, as his right side gives out on him. (*Id.*) He first got the cane in 2006, but when he first got it, he was just using it here and there. (*Id.*) In the past seven months, he has had to use it all the time. (*Id.* at 44-45.) He does not like the cane, but he does not like to fall, which is why he is using it. (*Id.* at 45.) He uses the cane to walk and to stand. (*Id.*) He needs it when standing because if he stands for ten minutes, his right leg gives out. (*Id.*) He can stand with his cane for about an hour at a time. (*Id.* at 46.) Without his cane, he can stand for about half an hour. (*Id.*) He can walk for three blocks, or about fifteen to twenty minutes, with his cane before he needs to stop. (*Id.*)

- He can sit for half an hour at a time. (*Id.* at 45.) After half an hour, his back starts to hurt. (*Id.*) The pain moves up towards his neck, and then his leg goes numb. (*Id.*) He has to get up and walk around with his cane. (*Id.* at 46.)

- He lives with his fiancée in a house that she rents. (*Id.* at 46-47.) He is responsible for taking out the garbage and taking out the dog. (*Id.* at 47.) Cooking and cleaning are too hard for him to do. (*Id.*) When he cleans, he tries to clean and walk. (*Id.*) After 20 minutes he needs to sit down and grab his cane, which aggravates him. (*Id.*)

- He cannot read except for "little bitty words." (*Id.*) His fiancée helped him with his Social Security application. (*Id.*) He cannot write anything but his name. (*Id.* at 47-48.) He can count change. (*Id.* at 48.) He dropped out of school after the eighth grade. (*Id.*)

- He does have a driver's license. (*Id.*) He got his license three years ago. (*Id.*) He was able to pass the written exam after his fiancée read the book to him and then taking the earphone test. (*Id.*) He drives two to three times a week. (*Id.* at 49.) He drives to the store or to take his fiancée to the store. (*Id.*)

- He met his fiancée through a friend. (*Id.*) They have been together for twenty-five years. (*Id.*) His fiancée receives disability benefits. (*Id.*) He has to help her get off the couch and out of bed. (*Id.* at 50.) His fiancée does everything else. (*Id.*) She has to remind him to do things because he forgets. (*Id.*) He almost forgot his disability hearing. (*Id.*)

- He has been sober for three years now. (*Id.* at 52.) He became sober after his fiancée asked him to quit drinking. (*Id.* at 53.)

- He was not on any medications. (*Id.*)

- His back pain and his right leg are what keeps him from working. (*Id.*)

- His hobby is watching TV.  (*Id.* at 54.)  He does not see his brothers because they do not like him.  (*Id.* at 55.)  He showers once a week because he forgets to and his fiancée must remind him.  (*Id.*)  He does not hang out with any friends.  (*Id.*)

The VE testified Marshall had past work as a roofer helper.  (*Id.* at 58.)  The ALJ then posed the following hypothetical question:

> At this time, sir, I'd ask you to assume a hypothetical individual with the past job you just described. I'd further ask you to assume that the hypothetical individual is limited to the following.
>
> The hypothetical individual would fall with the exertional category of light, but would have the following further restrictions. The hypothetical individual would be limited insofar as they would only occasionally be required to climb ramps and stairs.
>
> Never climb ladders, scaffolds or ropes.  The hypothetical individual would be limited to occasionally balancing, occasionally stooping, never kneeling or crawling.  The hypothetical individual would be limited insofar as they would be limited to simple tasks.
>
> Limited to routine and repetitive tasks. Would be limited to hearing and understanding simple oral instructions. Limited to communicating simple information. The hypothetical individual would be limited to simple work related details.
>
> The hypothetical individual would be -- would require a static work environment, and by static, I mean the hypothetical individual would be limited to tolerating few changes in a routine work setting.
>
> However when said changes did occur, they would need to take place gradually, and would occur infrequently. The hypothetical individual would be limited insofar as they would be limited to occasional interaction with co-workers.
>
> The interaction would be casual in nature and it would be a small group of co-workers, and the contact would be casual in nature. The hypothetical individual would be limited to occasional interaction with the public.   With -- and that interaction would be superficial in nature.

(*Id.* at 58-59.)

18

After clarifying there was no restriction on the hypothetical individual's interaction with supervisors in response to a question from the VE, the ALJ provided additional information for the hypothetical:

> And by superficial in regards to the interaction with the public, if a member of the public -- by superficial, I mean if a member of the public were to approach and inquire as to the nearest restroom, the hypothetical individual would be able to provide that information.
>
> But that would be the extent. And finally, sir, the hypothetical individual would be limited to -- would not be able to perform at a production rate pace such as that of assembly line worker, but could perform goal oriented work such as that as a office cleaner.
>
> Mr. Wright, with those restrictions, could the hypothetical individual be able to perform the past job described earlier in your testimony?

(*Id.* at 59-60.)

The VE testified the hypothetical individual would not be able to perform Marshall's past work as a roofer helper.  (*Id.* at 60.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as garment sorter, checker, and marker.  (*Id.*)

The ALJ then asked whether a hypothetical individual who needed a cane for walking on occasion could perform the sample jobs offered in response to the first hypothetical.  (*Id.* at 61.)  The VE testified such an individual could perform the sample jobs identified in response to the first hypothetical.  (*Id.*)

The ALJ then modified the hypothetical to reflect a sedentary level of exertion.  (*Id.*)  The VE testified the hypothetical individual could perform representative jobs in the economy, such as sorter, ink printer, and table worker.  (*Id.* at 61-62.)

The ALJ then added an additional restriction to the earlier hypotheticals as follows:

> Thank you, sir. And if you were to add to the earlier hypotheticals the following further restriction, and that would be that due to inability to keep up and perform the tasks of the job, the hypothetical individual would find themselves falling behind so much that they'd be off task 20 percent of any given workday.

With that further restriction add to the earlier hypotheticals, any of the earlier hypotheticals, would a hypothetical individual be able to perform the sample jobs that you offered in response to your testimony?

(*Id.* at 62.)  The VE testified that amount of time off-task would be work preclusive.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since August 5, 2016, the application date (20 CFR 416.971 *et seq.*)

2.    The claimant has the following severe impairments: adjustment disorder with mixed anxiety and depressive mood, reading learning disorder, SLD with math impairment and written expression impairment, and grade 1 anterolisthesis (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds, occasionally balance, occasional stoop, never kneel, and never crawl.  The claimant is limited to simple tasks and routine and repetitive tasks.  The claimant is limited to hearing and understanding simple oral instructions and is limited to communicating simple information. The claimant is limited to simple work-related details.  He would require a static work environment, meaning he would be limited to tolerating few changes in a routine work setting; however, when said changes do occur, they would need to take place gradually and would occur infrequently.   Further, the claimant is limited to occasional interaction with a small group of coworkers where the contact would be casual in nature.  He is limited to occasional, superficial interaction with the public, superficial meaning if a member of the public were to approach and inquire as to the nearest restroom, the claimant would be able to provide that information but that would be the extent.  The claimant would not be able to perform at a production rate pace such as that of an assembly line worker but could perform goal-oriented work such as that of an office cleaner.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.     The claimant was born on December **, 1968 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 5, 2016, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-28.)

## V.      STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)

("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Marshall argues the ALJ failed to properly evaluate the evidence in this case in several ways. (Doc. No. 12 at 12.) First, the ALJ assigned great weight to the state agency physician opinions but found Marshall capable of light work, even though the state agency physicians found Marshall was limited to

standing and/or walking four hours a day – a limitation which Marshall argues limits him to sedentary work. (*Id.* at 12-13.) Second, the ALJ "erroneously did not consider those parts of the opinions which were contrary to his desire to find Marshall was not disabled" and "disregarded the recommendations that Marshall could only stand/walk four hours a day." (*Id.* at 17.) Third, Marshall maintains the ALJ erred in his assessment of the state agency psychological opinions. (*Id.* at 14-15.) Fourth, "the ALJ erroneously ignored the fact that Marshall used a cane." (*Id.* at 16.)

The Commissioner responds that the ALJ "reasonably assessed" Marshall's physical and mental residual functional capacity ("RFC"). (Doc. No. 14 at 6-15.) The Commissioner did not respond to Marshall's argument that the ALJ erred in disregarding the state agency physicians' opinion that Marshall was limited to four hours of standing and/or walking.[4]

Because the Court finds the ALJ failed to explain why he did not adopt the state agency physicians' limitation to four hours standing and/or walking and this matter must be reversed and remanded as a result, and in the interests of judicial economy, the Court does not reach Marshall's other assignments of error.

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2).[5] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. § 416.946(c), and must consider all of a claimant's medically determinable

---

[4] The Commissioner asserts, "Plaintiff's underdeveloped arguments fail to show any reversible error on the part of the ALJ and should be rejected." (Doc. No. 14 at 6.) The Court notes the Commissioner argues waiver only as to Marshall's argument regarding his cane usage. (*Id.* at 8-11.)

[5] This regulation has been superseded for claims filed on or after March 27, 2017. As Marshall's application was filed in August 2016, this Court applies the rules and regulations in effect at that time.

impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

The ALJ is obligated to consider the record as a whole.  *Hurst v. Secy'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985).  "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). "'[W]here the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.'"  *Davidson v. Comm'r of Soc. Sec.*, No. 3:16CV2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018) (quoting *Moscorelli v. Colvin*, No. 1:15-cv-1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016)) (citing SSR 96-8p, 1996 WL 374184, at *7); *Cooper v. Comm'r of Soc. Sec.*, No. 2:18-cv-67, 2018 WL 6287996, at *5 (S.D. Ohio Dec. 3, 2018) ("[W]here, as here, the ALJ assigns significant weight to a particular opinion and states it is consistent with the record, he must incorporate the opined limitations or provide an explanation for declining to do so.") (citations omitted), *report and recommendation adopted by* 2019 WL 95496 (S.D. Ohio Jan. 3, 2019).  *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her*, 203 F.3d at 391.

25

An ALJ must provide a discussion at each step "in a manner that permits meaningful review of the decision." *Boose v. Comm'r of Soc. Sec.*, No. 3:16cv2368, 2017 WL 3405700, at *7 (N.D. Ohio June 30, 2017) (quoting *Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014). This discussion must "build an accurate and logical bridge between the evidence" and the ALJ's conclusion. *Snyder*, 2014 WL 6687227, at *10 (quoting *Woodall v. Colvin*, No. 5:12 CV 1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

The ALJ's analysis included the following discussion of the state agency reviewing physicians' opinions:

> As for the opinion evidence, the undersigned considered the opinions of the State agency consultants (Ex. IA, 3A). The State agency medical consultant at the initial level, David Knierim, M.D., opined that the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, *stand and/or walk four hours in an eight-hour workday*, and sit about six hours in an eight-hour workday. The claimant would be limited to occasional push and/or pull in the right lower extremity. The claimant could occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, unlimited balance, and frequently stoop, and unlimited kneel, crouch, and crawl. The claimant should avoid all exposure to hazards, such as unprotected heights and heavy dangerous machinery. At the reconsideration level, Diane Manos, M.D. opined that the claimant could occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, unlimited balance, and occasionally stoop, kneel, crouch, and crawl.
>
> The undersigned gives great weight to these opinions because the State agency medical consultants examined the medical record, are acceptable medical sources, and have program knowledge. *The undersigned also finds that these opinions are consistent with diagnostic testing and examinations* that demonstrated the claimant's back condition but maintained intact sensation, equal and symmetric reflexes, and generally normal strength (Ex. lF/6-7, 9, 11, 2F/6, 8-9, 11, 7F/6, 8F/5, 12). The undersigned also finds that progress notes that showed improvement with treatment, for example, physical therapy, support these opinions (Ex. 8F/5, 12F/2, 4-5, 7-9, 11).

(Tr. 23-24) (emphasis added).

Despite so finding, the ALJ determined Marshall possessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined

26

in 20 CFR 416.967(b) except the claimant can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds, occasionally balance, occasional stoop, never kneel, and never crawl.  The claimant is limited to simple tasks and routine and repetitive tasks.  The claimant is limited to hearing and understanding simple oral instructions and is limited to communicating simple information.  The claimant is limited to simple work-related details.  He would require a static work environment, meaning he would be limited to tolerating few changes in a routine work setting; however, when said changes do occur, they would need to take place gradually and would occur infrequently.  Further, the claimant is limited to occasional interaction with a small group of coworkers where the contact would be casual in nature.  He is limited to occasional, superficial interaction with the public, superficial meaning if a member of the public were to approach and inquire as to the nearest restroom, the claimant would be able to provide that information but that would be the extent.  The claimant would not be able to perform at a production rate pace such as that of an assembly line worker but could perform goal-oriented work such as that of an office cleaner.

(*Id.* at 20.)   Absent is the restriction to four hours of standing and/or walking that the ALJ specifically credited in his analysis.  (*Id.* at 23-24.)

While there is no requirement that the ALJ adopt the opinions in their entirety by giving them great weight, the ALJ was still required to explain why the opinions were not adopted as the RFC conflicted with them.  SSR 96–8p at *7.  Further, the ALJ must always build an "accurate and logical bridge" from the evidence to his conclusions.  Here, the ALJ failed to include the standing and/or walking limitation above in the RFC or explain why he did not incorporate that limitation into the RFC.  (Tr. at 21-25.)  This "failure is all the more glaring given that the ALJ afforded 'great weight'" to the state agency reviewing physicians' entire opinions.  *Davidson*, 2018 WL 1453472, at *2.  Moreover, the ALJ explicitly mentioned the standing and/or walking limitation opined by the state agency physicians, found their opinions were supported by and consistent with the record, recognized their knowledge of agency standards – and then failed to include this limitation in the RFC or explain why he was not including it in the RFC.

"In these circumstances, the ALJ's failure to his decision deprived this court of a 'logical bridge between the evidence on the record and his conclusion," *Flesicher v. Astrue*, 774 F. Supp. 2d 875, 877

27

(N.D. Ohio 2011) . . . ." *Davidson*, 2018 WL 1453472, at *2. Because the ALJ's opinion does not permit the Court to follow the "reasoning and treatment of" the state agency reviewing physicians' opinions, the Commissioner's decision must be vacated and remanded for further proceedings. *Id.* at *2 (quoting *Davis v. Comm'r of Soc. Sec.*, No. 1:16 CV 2446, 2018 WL 137779, at *10 (N.D. Ohio 2018); *see also Cooper*, 2018 WL 6287996, at *5.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**

Date:  July 6, 2020                                         *s/ Jonathan Greenberg*
                                                                     Jonathan D. Greenberg
                                                                     United States Magistrate Judge